

FILED

Jan 09 2024, 8:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Amy E. Karozos
John Pinnow
Lindsay Van Gorkom
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Justin F. Roebel
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Esther Martin,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

January 9, 2024

Court of Appeals Case No.
22A-PC-2574

Appeal from the Elkhart Superior
Court

The Honorable Teresa L. Cataldo,
Judge

Trial Court Cause No.
20D03-2002-PC-8

**Opinion by Chief Judge Altice**
Judge Foley concurs.
Judge Riley dissents with separate opinion.

**Altice, Chief Judge.**

## Case Summary

Esther S. Martin was charged in 2011 with two counts of Class A felony child molesting. Her 2014 jury trial ended in a mistrial after a juror sent a note to the judge asking if Martin's mental state had been assessed. Ultimately, the trial court found Martin incompetent to stand trial, and Martin was committed to a state hospital for restoration efforts. In early 2015, two treating doctors at the hospital reported that Martin had become competent to stand trial, and she was retried to a jury in 2016, found guilty as charged, and sentenced to two consecutive forty-year terms. On direct appeal, this court affirmed Martin's convictions but ordered that the sentences be served concurrently.

Martin filed an amended petition for post-conviction relief (PCR), which the court denied. Martin now appeals, claiming that her trial counsel provided ineffective assistance (1) by failing to re-challenge Martin's competency prior to the 2016 trial, (2) by failing to present mitigating evidence at sentencing pertaining to Martin's intellectual functioning, and (3) by failing to object at sentencing to the State's argument that Martin's family or community knew she had sexual tendencies but failed to protect children from her.

We affirm.[1]

---

[1] We held oral argument at the Court of Appeals Courtroom on November 16, 2023. We commend counsel on their oral and written advocacy.

## Facts & Procedural History

[4] Martin, born in 1984, was removed from her birth parents at around fifteen months of age and placed in foster care with Andrew and Arlene Martin (the Martins), who adopted Martin when she was about four years old.[2] The Martins are Old Order Mennonite and have five children, all adopted.

[5] Martin exhibited developmental delays as a child. She attended a Mennonite school and required special attention both academically and to address issues of impulsivity and acting out. Martin was required to repeat the fifth grade, and she did not continue with education past eighth grade, although that was not uncommon in her community. Thereafter, she lived with her parents in rural Elkhart County, helping with household chores. Martin never worked outside the home.

[6] At some point, the Martins began providing childcare in their home to six or so children, including the victim in this case, B.H., who began going to the Martins' home as a toddler. Martin was about eighteen years old at the time and helped provide the childcare. As found in our memorandum opinion on direct appeal:

> In January 2011, B.H. told his father that Martin had been touching him inappropriately. At this time, B.H. was ten years old, and Martin was twenty-six. B.H. believed that the touching began when he was six or seven years old. B.H. said that the first

---

[2] They also adopted Martin's younger sister, Barbara.

occasion occurred when he was in the bathroom, and Martin came in, closed the door, and kissed his "privates." Further similar incidents involving Martin kissing B.H.'s genitals or putting his penis in her mouth occurred once or twice a week over the next few years. B.H.'s parents reported his statements to police, who then arranged to interview Martin.

Before the [January 11, 2011] interview, Martin's father told Detective Ryan Hubbell of the Elkhart County Sheriff's Department that Martin communicated at the level of a twelve-year-old child. . . . Detective Hubbell went through each of the rights individually and attempted to explain them to Martin in language she would understand. . . . After initialing that she understood each of the rights and signing a waiver of her rights, Detective Hubbell began questioning Martin.

Throughout the eighty-minute-long interview, Martin consistently and repeatedly denied ever touching B.H. in a sexual manner. She did say that B.H. once tried to look up her dress and that she scolded him, and on at least one other occasion, B.H. brushed up against her and touched her and she again scolded him. . . . Martin consistently referred to penises as "pee pees," and at one point asked Detective Hubbell why he was repeatedly talking about "peanuts." Detective Hubbell explained that penises were the same as "pee pees." Martin also said it made her "feel like throwing up" to think about kissing a penis.

Also during the interview, Martin said that ten to fifteen years ago she had a "problem" about wanting to touch the "pee pees" of children brought to her mother's daycare but that she had grown out of it.

*Martin v. State*, No. 20A05-1605-CR-1016 (Ind. Ct. App. July 14, 2017) (citations to record omitted). On October 7, 2011, the State charged Martin with two counts of Class A felony child molesting related to acts with B.H.

*First Trial*

[7] After Martin was charged, trial counsel Thomas Leatherman (Leatherman) referred her to clinical psychologist Gerald Wingard, PhD for psychological testing. Dr. Wingard met with Martin in December 2011 and administered, among other things, the Wechsler Adult Intelligence Scale – III (WAIS) to determine her intellectual and cognitive functioning level. Results indicated that Martin's full scale IQ was 62, which "occurs at the Mildly Mentally Deficient" range of intelligence. *Direct Appeal Confid. Exhibits Vol. II* at 4.

[8] The matter proceeded to jury trial on July 7, 2014. Prior to voir dire, the court heard argument on Martin's pending Motion for Special Assistance, which asserted that Martin "functions between 4th and 8th grade levels" and requested that Martin's mother, Arlene, be allowed in the court room and seated close enough to Martin so that they "can have meaningful conversations about the process of the trial." *Direct Appeal Confid. Appendix Vol. 3* at 18. The trial court granted the motion to the extent that it would allow someone to sit with Martin and provide the requested assistance, although not Martin's mother as the State indicated the possibility of calling her as a witness.

[9] After voir dire, a juror sent a note to the judge asking if Martin's mental state had been assessed. The court and counsel for both parties met in chambers,

and Dr. Wingard was consulted over the phone. On Leatherman's motion, the court declared a mistrial and ordered competency evaluations by Gary Seltman, M.D. and LaRissa M. Chism-Buggs, M.D., who separately evaluated Martin in September 2014. In their respective reports, each found Martin not competent to stand trial.

[10] Dr. Seltman's report stated that Martin had a "poor command of the judicial process and players involved," "a fairly poor understanding of the consequences" if found guilty, and "did not appear to fully appreciate the seriousness of the charges against her." *Id.* at 22. Dr. Chism-Buggs found that Martin had "a basic appreciation of right versus wrong and can differentiate between lying and telling the truth" and had a very basic understanding of the charges against her, the adversarial nature of the judicial system, and of her attorney working on her behalf, but "lack[ed] an appreciation of the proceedings against her" such that she would be unable to assist her attorney in her own defense. *Id.* at 27.

[11] In October 2014, Dr. Wingard also submitted a report to the court based on his December 2011 testing of Martin. He reported that Martin's results placed her in the first percentile and that individuals in that range learn slower, tend to misunderstand and misperceive situations and depend on others for solutions or directions, their social interactions are immature, and their memory for specific types of information and ability to consider consequences is usually weak. *Direct Appeal Confid. Exhibit Vol. II* at 6. He opined that Martin lacked "the

necessary ability and skills to assist in her defense" and was not competent to stand trial. *Id*. at 7.

*Commitment*

[12] In November 2014, the trial court committed Martin to the Division of Mental Health and ordered the superintendent to certify within ninety days whether Martin had a substantial probability of obtaining comprehension sufficient to understand the proceedings and make a defense in the foreseeable future. Martin was admitted to Madison State Hospital (MSH) on December 8, 2014, for treatment and evaluation.

[13] Martin was evaluated by Vincent Porter, M.D., who created a psychiatric treatment plan for Martin. According to MSH records, the stated "goal" for Martin was that she "will know and have a basic understanding of conditions for participating in her own defense," understand the charges against her, the potential consequences, and the trial process. *PCR Confid. Exhibits Vol. 1* at 175. The identified "objective" was that Martin would be able to "sit for and participate in a competency evaluation on legal terms administered by the Legal Education Facilitator/Co-facilitator scoring a 70% or above by being able to define the definitions and/or roles of the courtroom personnel in her own words." *Id.* In December, January, and into early February 2015, Martin participated in the Legal Education Group, where she received education about legal terms and processes, was given homework, and was regularly evaluated to check progress. On January 28, the facilitator of the Legal Education Group

reported that Martin had received a score of 90.2%, and she recommended that Martin be seen for a competency evaluation.

[14] In early February 2015, Martin was evaluated by two MSH doctors – first by Gina Benz, PsyD and, a week later, by Dr. Porter – with each concluding that Martin's competency had been restored. Dr. Benz administered the Evaluation of Competency to Stand Trial-Revised (ECST-R) and reported that Martin "presents with a good factual and rational understanding of the courtroom proceedings, court participants, and her role in the trial" and "evidences a good understanding of and ability to consult effectively with her counsel in her defense." *Direct Appeal Confid. Appendix Vol. 3* at 35. In addressing Martin's documented limited intellectual functioning, Dr. Benz opined that "it appears her IQ score is an underrepresentation of her abilities within the realm of being competent to stand trial in defense of her current legal issues." *Id.*

[15] Dr. Porter's report similarly expressed skepticism about Martin's prior IQ score, agreeing that her intelligence was "below average" but that "her low intellect IQ of 62 is either underestimated or does not strongly correlate with her ability to comprehend court proceedings and legal terminology. Her memory is intact. She is coherent and without psychosis." *Id.* at 39, 40. Both doctors referred to and relied in part on the group facilitator's report that Martin had scored 90.2% on a recent legal terminology test.

*Second Trial*

The case proceeded to jury trial on January 26 and 27, 2016.[3] Prior to trial, Leatherman filed a motion to suppress Martin's January 2011 interview with Detective Hubbell, arguing that Martin's waiver of rights was not freely and voluntarily made because, due to her mental deficiencies, she did not fully understand the waiver of *Miranda* rights or understand the significance of it. At the suppression hearing, Dr. Wingard and Martin's parents testified for the defense,[4] and Detective Hubbell testified for the State. The trial court denied the motion to suppress, recognizing that Martin had diminished mental capacity but concluding that she knowingly and voluntarily waived her *Miranda* rights.

At trial, the State presented the testimony of Detective Hubbell, B.H., and his parents. A redacted version of Martin's interview with Detective Hubbell was played for the jury. The defense called Martin's sister, Barbara, to testify. Following the close of evidence, the court read the following stipulation to the jury: (1) psychologist Dr. Wingard evaluated Martin in 2011 and she "was found to have an IQ of 62 and a diagnosis of Mild Mental Retardation," and (2) psychiatrist Dr. Porter evaluated her in 2015 and found her to be "higher functioning than Mild Mental Retardation and gave a diagnosis of Low

---

[3] The trial judge for the second trial was not the same as in the first trial.

[4] The court allowed Dr. Wingard's October 2014 report to be admitted into evidence for purposes of Martin's IQ scores in December 2011 but struck the portion of the report in which he opined on Martin's competency.

Intellectual Functioning, which is a modest upgrade[.]" *Direct Appeal Confid. Appendix Vol. 3* at 90; *Direct Appeal Transcript Vol. V* at 68. After the close of evidence, Leatherman requested and received permission from the court to allow Martin to consult with her parents about whether to testify. Martin thereafter stated on the record her decision not to testify.

[18] During closing argument, the State urged that, although Martin had lower intellectual functioning, she knew right from wrong, took advantage of B.H. when opportunities would arise, and exhibited self-preservation skills when talking to Detective Hubbell, as she controlled what information she disclosed and only released more once Detective Hubbell told her he knew about certain incidents from her parents. Leatherman questioned B.H.'s credibility and suggested that he took advantage of Martin because she was low functioning. The jury found Martin, then age thirty-two, guilty as charged.

## *Sentencing*

[19] At the sentencing hearing, Leatherman presented argument only, asserting that mitigating circumstances existed, including the recognized mental challenges that Martin had faced all her life. Leatherman argued that the court should also consider as mitigating that Martin had no prior criminal history, was adopted and raised in a strict religious community, and had family and community support throughout the process. *Direct Appeal Transcript Vol. V* at 130. Leatherman asked the court to impose a minimum sentence.

[20] The State called B.H.'s father to testify. Thereafter, the State argued that while Martin does not have an official criminal record, there were prior incidents of sexual misconduct of which her parents were aware. As is relevant here, the prosecutor then stated:

> There was awareness, an absolute awareness, of sexual deviant tendencies on the part of Esther Martin, and yet no one did anything to protect other children from her.

*Id*. at 138. The State maintained that, given the other, known incidents that went unchecked, Martin's lack of criminal history had "little value." *Id*.

[21] The State further argued that, although Martin had a diminished mental capacity, she was a "master manipulator" and "self-serving opportunist," waiting to engage in acts until adults were not present, she violated a position of trust, and, during the time she was at MSH, she inappropriately touched a peer, despite being specifically instructed to stay away from that person. *Id*. at 138, 142. The State asked the court to impose consecutive forty-year sentences.

[22] The court recognized the existence of aggravators and mitigators but found that the aggravators "far outweighed" the mitigators. *Id*. at 146. The court viewed Martin as an "opportunist," having contact with B.H. when no one was around. *Id*. at 145. The court sentenced Martin to consecutive forty-year terms.

### Direct Appeal

Martin appealed, asserting two issues: (1) the trial court should not have admitted into evidence her recorded interview with Detective Hubbell, and (2) her sentence was inappropriate. This court found that even if her interview with Detective Hubbell was conducted in violation of *Miranda*, such error was harmless, as she never confessed during the interview, B.H. testified about Martin's repeated sexual abuse, and B.H.'s forensic interview was also admitted. *Martin v. State*, 20A05-1605-CR-1016 (Ind. Ct. App. July 14, 2017). A majority of the court reduced her sentenced to concurrent forty-year terms.[5]

### PCR Proceedings

In February 2020, Martin filed a pro se petition for post-conviction relief, which was later amended, by counsel, on May 22, 2020. Martin's amended PCR petition alleged that she received ineffective assistance of trial counsel on sixteen bases, including as is relevant here: (1) Leatherman did not request a hearing on Martin's competency to stand trial prior to her January 2016 trial; (2) he did not investigate and present mitigating evidence at sentencing; (3) he did not object to the State's argument at sentencing concerning inaction taken by her family and community to protect children from Martin's known tendencies; and (4) he did not argue at sentencing that Martin should receive credit against her sentence for the time she was confined at MSH prior to trial.

---

[5] The dissent believed that a thirty-year sentence was appropriate given that Martin had undisputed mental limitations, "was found to be incompetent to stand trial at one time," and had no criminal history. *Id*. at *5.

Martin's PCR petition alleged that appellate counsel was also ineffective, including for failing to assert that Martin should have received credit against her sentence for her time at MSH.

[25]    The PCR hearing began on November 1, 2021 and continued to January 4, 2022. Martin called twelve witnesses, including Dr. Wingard, Drs. Chism-Buggs and Seltman (who found Martin incompetent in September 2014), Leatherman, appellate counsel, Martin's parents, her sister, a friend, and two teachers. Martin also presented the testimony of psychologist James Cates, Ph.D., who had reviewed Martin's records from MSH and the evaluations of MSH Drs. Porter and Benz. The reports of Drs. Wingard, Chism-Buggs, Seltman, and Cates were admitted into evidence, along with Martin's medical records from MSH and her school records.

[26]    Dr. Wingard testified that people with Martin's level of intellectual functioning get confused, do not have strong memory capability, and often defer to authority such as "if something is told to them often enough, they're going to believe it." *PCR Transcript* at 33. Drs. Chism-Buggs and Seltman addressed their respective 2014 court-ordered evaluations of Martin in which they found Martin not competent to stand trial. Dr. Chism-Buggs stated she did not notice any indicators of malingering or exaggerating when she evaluated Martin. Dr. Seltman estimated that he had conducted around 500 competency evaluations, and, of those, he found in about 95% of cases that the individual was competent. He explained that, in concluding that Martin was not competent, he felt that she did not fully appreciate the seriousness of the charges, did not

understand the consequences, and did not understand "what's going on with the process." *Id*. at 160. His testimony noted that intellectual disabilities are not treatable through medication or psychiatric treatment.

[27] Dr. Cates, who possessed experience working with Old Order Mennonite and Amish populations, stated in his report that Martin's diminished mental capacity combined with the Mennonite background and cultural practices all contributed to limitations in Martin's ability to participate in her own defense. He criticized the treatment Martin received at MSH, viewing it as being "drilled basically" on memorization of words and their meanings. *Id.* at 75.

[28] Dr. Cates's report addressed the MSH records, including Legal Education Group's participation records. He observed that there was no way to confirm whether Martin actually "met the [required] 70% retention criteria" and highlighted that on February 5, 2015 – which was after her February 2 evaluation by Dr. Benz but before Dr. Porter's evaluation – Martin recalled only 58% of terms with no prompts and 25% still required five verbal prompts. *PCR Confid. Exhibits Vol. 1* at 44. Dr. Cates pointed out that, despite these scores, Dr. Porter subsequently relied, in part, on the facilitator's report that Martin had achieved a 90.2% score on definitions.

[29] Dr. Cates also noted that Dr. Porter utilized "the McGarry criteria," which involved asking Martin a series of questions to ascertain her understanding of legal matters, and that the American Academy of Psychiatry's 2007 Practice

Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial characterized the McGarry criteria as weak and unreliable.

[30]     As to Dr. Benz, Dr. Cates observed that she did not administer any screening test of intellectual functioning yet opined that Martin's intelligence was higher than the 62 IQ score. Dr. Cates pointed out that although Dr. Benz administered a recognized competency assessment instrument, ECST-R, she did not report the specific scores.

[31]     Dr. Cates testified about his own meeting with Martin on May 21, 2021, during which he administered a variety of assessments, including the ECST-R evaluation that Dr. Benz had used. In contrast to her conclusions, Dr. Cates determined that Martin's scores reflected "a severe impairment in her ability to consult with counsel, and significant difficulty engaging in rational understanding of courtroom proceedings" and "a moderate impairment in her factual understanding of the courtroom." *Id.* at 50. When Dr. Cates tested Martin with the same legal terms that the MSH Legal Education Group had used, Martin knew about half of the thirty terms. Dr. Cates viewed these results as "dismal, at best." *Id.* at 53.

[32]     Dr. Cates's report opined that MSH failed to use available tools to determine Martin's competency and instead relied on "outdated measures and clinical inference alone" to declare she had been restored to competency. *Id.* at 54. He concluded that Martin's competency was never restored and she was re-tried although equally as incompetent as she was at the time of the first trial.

[33] Each of Martin's parents testified that they saw no improvement in Martin's functioning or capabilities upon her release from MSH. Two teachers testified to Martin's struggles at school and, when asked about Martin's strengths as a student, each responded, "Recess." *PCR Transcript* at 129, 132. Martin's sister and a childhood friend each discussed Martin's lower functioning, need for assistance, and childlike behavior.

[34] Leatherman testified that he had been an attorney for approximately fifty years, with his practice focused primarily on criminal and domestic cases. Although he had tried thousands of cases and handled many child molestation cases over the years, he recalled having only one other case in which the defendant's competency was at issue. He testified that after he received the two MSH reports stating that Martin's competency had been restored, he did not contact those doctors, and he did not reach back out to Drs. Seltman or Chism-Buggs, although he did have one or more telephone conversations with Dr. Wingard.

[35] Leatherman stated that he argued for mitigating circumstances at sentencing but did not call witnesses because

> [n]o one informed me that they had any witnesses that they wanted me to call. I wasn't made aware of any information we could provide to the Court that I thought would be helpful that [the court] didn't already have.
>
> * * *
>
> If I had been advised that there was some witness that wanted to provide some information about [Martin] that I thought would

be helpful, I would have indeed called her or called the witness. But I was not provided with any. And I couldn't think – [Martin] didn't have a job outside of her home. Her parents have already testified. We had her school records. . . . [W]e had her intelligence issues, and that was all in front of the Court.

*Id.* at 52.

[36] As to the State's argument at sentencing that there was an awareness by others of Martin's sexual deviant tendencies yet no one did anything to protect children from her, Leatherman acknowledged that generally sentencing is to be based on the individual defendant but he was not particularly concerned about the State arguing a "collective kind of guilt." *Id*. at 54.

[37] The parties submitted proposed findings and conclusions, and on October 5, 2022, the PCR court issued a sixteen-page order, which determined that neither trial nor appellate counsel was ineffective.[6] As is relevant to the current claims of ineffective assistance of trial counsel, the court's order found:

33. Petitioner opines that counsel should have been aware that she lacked the ability to understand the proceedings and assist in her defense in January 2016 because she had already been determined incompetent to stand trial in January 2015 based on low cognitive function. However, later in 2015, two doctors at [MSH] found that Petitioner did understand courtroom proceedings, had the ability to consult effectively with her counsel, and did not currently demonstrate mental health

---

[6] The PCR court issued an Amended Abstract of Judgment to reflect jail credit plus good time credit for the 69 days spent at MSH for restoration efforts.

symptoms or intellectual deficits that would interfere with her ability to participate in her defense at that time. In other words, the reports indicated that Petitioner had been restored to competency. . . . Furthermore, a low IQ does not necessarily indicate an inability to comprehend legal proceedings. . . . No contemporaneous evidence existed that cast doubt on Petitioner's competence at that time. To the contrary, the evidence was that Petitioner was then competent to stand trial in January 2016. This is true even in light of Dr. Cates' testimony at the post conviction hearing regarding tests he had performed in 2021. Dr. Cates simply presented another opinion based on different test results that were not available to counsel in 2016 . . . Members of Petitioner's family and friends testified at the post conviction hearing as to Petitioner's "child likeness" struggles in school, inability to manage funds or go grocery shopping and poor reading. None of these amounted to evidence supporting that Petitioner was incompetent to stand trial. Counsel's failure to further investigate whether Petitioner was competent to stand trial and seek another competency evaluation between Petitioner's release from [MSH] and her January 2016 trial did not amount to ineffective assistance of counsel.

\* \* \*

42. Petitioner avers that trial counsel was ineffective at sentencing for failing to investigate and present mitigating evidence[.] . . . Petitioner admitted that her counsel argued the existence of mitigating circumstances at sentencing, however, contends he should have gone further and presented witnesses and exhibits on her behalf. . . . Petitioner [] argues that had counsel investigated further, he may have discovered an expert such as Dr. Cates, who could have reviewed the prior competency evaluations completed by [MSH] and testified from a different perspective. Trial counsel testified at the post conviction hearing that no one ever informed him of any witnesses they wanted to call, Petitioner did not have a job

outside the home, that her parents had already testified, and her intelligence issue[s] were already before the Court. In other words, there was nothing left for anyone to say. Counsel had no reason to investigate further. The decision not to call a witness whose testimony is cumulative does not constitute ineffective assistance of counsel.

43. Petitioner asserts that her trial counsel was also ineffective for failing to object to the State's argument at sentencing . . . that Petitioner's family and community failed to protect children from Petitioner even when they had awareness of sexual deviant tendencies on the part of Petitioner. . . . Petitioner contends that the sentence imposed would have been different had trial counsel objected to this line of argument. The record reflects that this argument was one of many aggravating factors presented to and already known by the Court. This one circumstance would not have made any difference as to the sentence.

*PCR Appendix* at 120-121, 125-27. The PCR court rejected Martin's claim that, even if the errors did not individually rise to the level of ineffective assistance of counsel, the cumulative effect amounted to ineffective assistance.

[38]    Martin now appeals. Additional information will be provided below as needed.

## Discussion & Decision

### *Standard of Review*

[39]    Post-conviction proceedings are not a "super appeal." *Barber v. State*, 141 N.E.3d 35, 41 (Ind. Ct. App. 2020), *trans. denied*. They provide a narrow remedy to raise issues that were not known at the time of trial or were unavailable on direct appeal. *Id*. The petitioner must establish her claims by a

preponderance of the evidence. Ind. Post-Conviction Rule 1(5). A petitioner who has been denied relief faces a rigorous standard of review. *Dewitt v. State*, 755 N.E.2d 167, 169 (Ind. 2001).

> To prevail, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. When reviewing the post-conviction court's order denying relief, we will not defer to the post-conviction court's legal conclusions, and the findings and judgment will be reversed only upon a showing of clear error— that which leaves us with a definite and firm conviction that a mistake has been made. The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses.

*Barber*, 141 N.E.3d at 41 (internal quotations and citations omitted).

[40] To prevail on a claim of ineffective assistance of counsel, the petitioner must show that (1) counsel's performance was deficient, and (2) counsel's performance prejudiced the defendant. *Id*. at 42.

> A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. To meet the test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Failure to satisfy either prong will cause the claim to fail. When we consider a claim of ineffective assistance of counsel, we apply a strong presumption . . . that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. [C]ounsel's performance is presumed effective, and a

defendant must offer strong and convincing evidence to overcome this presumption.

*Id.* (internal citations and quotations omitted).

### 1. Competency

[41] Martin argues that Leatherman provided ineffective assistance because he failed to request another competency evaluation prior to the 2016 trial. A defendant is not competent to stand trial when she is unable to understand the proceedings and assist in the preparation of her defense. *Id.* at 42; *see also Dusky v. United States*, 362 U.S. 402, 402 (1960) (to be competent, defendant must have a "sufficient present ability to consult with h[er] lawyer with a reasonable degree of rational understanding … [and] a rational as well as factual understanding of the proceedings against h[er]").

[42] If a trial court is provided with "reasonable grounds for believing that the defendant lacks the ability to understand the proceedings and assist in the preparation of a defense," the court must set a hearing to address competency. Ind. Code § 35-36-3-1(a). The right to a competency hearing upon motion is not absolute, however. *Barber*, 141 N.E.3d at 43. Such a hearing is required only when a trial judge is confronted with evidence creating a reasonable or bona fide doubt as to a defendant's competency. *Id.* The presence of indicators sufficient to require the court to conduct a hearing under I.C. § 35-36-3-1 must be determined upon the facts of each case. *Mast v. State*, 914 N.E.2d 851, 856 (Ind. Ct. App. 2009), *trans. denied.* "A trial judge's observations of a defendant

in court are an adequate basis for determining whether a competency hearing is necessary; such a determination will not be lightly disturbed." *Id.*

[43] Here, the PCR court determined that, at the time of Martin's January 2016 trial, "[n]o contemporaneous evidence existed that cast doubt on Martin's competence," and, thus, Leatherman did not provide deficient performance by not requesting a competency hearing prior to the second trial. *PCR Transcript* at 121. Martin argues that this finding was clearly erroneous because such evidence did exist at that time, which should have caused Leatherman to investigate and ultimately challenge the reports of restored competency. If he had requested a competency hearing, Martin maintains that there is a reasonable probability Martin would have been found incompetent.

[44] In support, Martin points out that her limited intellectual functioning is undisputed, she was found to be incompetent in 2014, and Dr. Seltman's September 2014 report, which found that Martin would have a "fairly significant difficulty assisting in her own defense," stated that "this difficulty is not likely to be responsive to psychiatric treatment." *Direct Appeal Confid. Appendix Vol. 3* at 22. Furthermore, Martin argues, the MSH records – specifically her scores in the Legal Education Group – reflect a lack of appreciable improvement during her stay and that Leatherman should have recognized the suspect nature of the reported 90.2% score on January 28 because it was not consistent with Martin's other group participation records before and after that date. Martin argues that, despite having this available information, Leatherman failed to contact any of the doctors. She also urges

that Leatherman should have noted that, although the two MSH doctors opined that Martin's IQ was higher than previously reported, neither administered an intelligence test to Martin. Martin maintains that, given these various failures, Letherman's performance was deficient. We do not agree.

[45]     Martin was committed to MSH with the intended goal of restoration of competency. After around seventy days there, Drs. Benz and Porter each issued a report in February 2015 finding that Martin had been restored to competency. Dr. Benz reported that Martin "has made significant progress in her legal education classes [], receiving a passing score (90%) on the legal education assessments" and opined that Martin's tested IQ with Dr. Wingard possibly had underestimated her abilities. *Id.* at 31. Dr. Benz's sources included a review of Martin's records at MSH, consultation with MSH staff on Martin's unit, previous assessments of her, and a clinical interview with Martin that included administering to Martin: (1) Mini Mental Status Exam and (2) ECST-R, which includes a systematic screening for feigned incompetency. Although not outlining specific test scores, Dr. Benz reviewed in detail her findings, including that Martin "evidences a good factual understanding of the trial process and proceedings against her," "demonstrates a good understanding of the courtroom participants," and "does not show any self-defeating motivation or poor reasoning that would interfere with her ability to participate in her defense." *Id*. at 34.

[46]     Dr. Porter's report was based, in part, on his interaction with and treatment of Martin since her admission in December 2014, a review of Martin's unit chart

progress notes, and the group facilitator's report of a 90.2% score on a recent test of legal terminology. He also interviewed Martin and asked her a series of forensic questions to ascertain her understanding of basic legal matters. Like Dr. Benz, he opined that Martin's low IQ did not correlate with her ability to comprehend court proceedings and legal terminology and concluded that Martin "will be able to assist her counsel" with her defense. *Id*. at 40.

[47] Martin would have us find that Leatherman's performance was deficient for failing to question the validity of those two reports, urging that counsel should have dug into the supporting records and perhaps located a countering expert opinion, such as Dr. Cates. While all of that could have been done, we are unwilling to find that an objective standard of reasonableness based on prevailing professional norms required it to be done. We agree with the State that, given the two 2015 competency reports, "no reasonable attorney would have believed there was a need to re-challenge Martin's competency." *Appellee's Brief* at 27. Accordingly, we find, as did the PCR court, that Leatherman did not provide deficient performance by failing to seek a competency hearing before the second trial. Her ineffective assistance of counsel claim based on failure to request a competency hearing fails.

### 2. Sentencing- Mitigating Evidence

[48] Martin contends that – although Leatherman argued at sentencing about the existence of mitigating circumstances, including Martin's limited intellectual functioning – he performed deficiently by "failing to present available evidence of [her] intellectual disability." *Appellant's Brief* at 46. Our Supreme Court has

observed that the dispositive question in cases challenging whether counsel should have presented additional mitigating evidence is "what effect the totality of the omitted mitigation evidence would have had on [the] sentence." *Coleman v. State*, 741 N.E.2d 697, 702 (Ind. 2000).

[49] Martin contends that Drs. Seltman and Chism-Buggs "had relevant and favorable information about Martin's intellectual limitations," yet Leatherman failed to contact them. *Appellant's Brief* at 46, 50. Martin also suggests that Leatherman should have obtained the MSH records and recognized that the competing incompetent/competent doctor reports "were red flags warranting further investigation," which would have led counsel "to consult with an expert like Dr. Cates" to rebut the opinions of Drs. Porter and Benz that Martin's IQ was higher than Dr. Wingard had found it to be. *Id.* at 50.

[50] Leatherman testified at the PCR hearing that he did not call any witnesses at sentencing because he "wasn't made aware of any information . . . that [he] thought would be helpful that [the court] didn't already have." *PCR Transcript* at 52. For instance, Leatherman explained that there was no outside employment history to pursue, and her intelligence issues were already known by the court. The PCR court determined that Leatherman did not provide deficient performance, as Martin's intelligence issues were already before the court, and "there was nothing left for anyone to say." *PCR Appendix* at 126.

[51] We too find that Leatherman's performance was not deficient as the trial court was well aware of Martin's intellectual challenges. In addition to her parents

and Dr. Wingard testifying at the suppression hearing about her limited mental functioning, Detective Hubbell testified that Martin's parents told him that she functioned as a twelve-year-old. At trial, the parties' stipulation concerning her IQ was read to the jury. The trial court's comments at the sentencing hearing recognized her "diminished mental capacity" and identified it as a mitigating circumstance, although concluding that such did not outweigh the aggravators. *Direct Appeal Transcript Vol. V* at 145.

[52] Given this record, we agree with the State that "[t]here is no reason to infer that the trial court would have given greater weight to those circumstances if additional evidence of her diminished capacity had been presented at sentencing." *Appellee's Brief* at 30. While counsel could have provided more evidence of Martin's mental functioning, there is a presumption that counsel rendered effective assistance, and we are not persuaded that additional evidence about Martin's recognized intellectual limitations would have had any appreciable effect on the sentence imposed. Thus, the PCR court properly denied relief to Martin on this claim.

### 3. Sentencing – Alleged Improper Aggravator

[53] Lastly, Martin asserts that Leatherman provided ineffective assistance by failing to object to the State's argument at sentencing that Martin's family and community were aware of her sexual deviant tendencies yet failed to protect children from her, and instead, protected their own. Martin argues that the proper focus at sentencing is on the defendant, the crimes for which she is convicted, her background, and her personal culpability and that, here, the

State's argument was trying to punish Martin for failures of her family and/or community. As such, it was an invalid aggravating circumstance, to which Leatherman should have objected.

[54] At the PCR hearing, Leatherman testified that he did not object because (1) he was not overly concerned about the argument, and (2) in his experience, objecting during opposing counsel's argument had not been worthwhile or successful. The PCR court found that the community-awareness argument "was one of many" made by the State and that this one alleged aggravating circumstance "would not have made a difference as to the sentence." *PCR Appendix* at 127.

[55] Martin contends that the trial court obviously relied on the State's improper argument, given that it remarked, "So the family knew that she had a predisposition to this, and they allowed her to have the care and custody over the control of these children." *Direct Appeal Transcript Vol. V* at 146. Martin urges that the trial court's "improper reliance on collective punishment" during the sentencing hearing undermines confidence in the validity of the sentence. *Appellant's Brief* at 54.

[56] We are unconvinced, however, that Leatherman rendered ineffective assistance by failing to object. As the State observes, the argument was likely responsive to Martin's mitigating argument at sentencing that her family and community had supported her throughout the whole process and were present at the sentencing hearing. Moreover, while the trial court did mention the

family/community's complicity, it did not expressly identify such as an aggravator, and rather identified the aggravating circumstances as: the victim's young age, the offense occurred over a period of years, Martin violated a position of trust, and she had a history of inappropriate sexual behavior. Accordingly, we find that the post-conviction court did not err when it found that Leatherman did not provide ineffective assistance by not objecting to the State's argument about Martin's family and community not protecting children from her.

### Conclusion

[57] While Martin argues that, even if the individual alleged errors did not separately amount to ineffective assistance, Leatherman's representation as a whole constituted deficient performance that prejudiced her, as she "would not have gone to trial in 2016, let alone been convicted, if counsel had performed effectively." *Reply Brief* at 24. We find, however, that Leatherman's representation was consistent with professional norms and, as the State observes, "preserved a record that resulted in significant relief" on direct appeal. *Appellee's Brief* at 36. For the reasons discussed herein, Martin has not met her burden to show that the post-conviction court clearly erred in denying her petition.

[58] Judgment affirmed.

Foley, J., concurs.

Riley, J., dissents with separate opinion.

**Riley, Judge, dissenting.**

I respectfully part ways with the majority's affirmance of the post-conviction court's opinion, as I conclude that Leatherman's representation was inconsistent with prevailing professional norms and resulted in ineffective assistance when he failed to seek a competency hearing before Martin's second trial.

"It has long been accepted that a person whose mental condition is such that he lacks capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." Drope v. Missouri, 420 U.S. 162, 171 (1975). In order to be competent to stand trial, a defendant must have a "sufficient present ability to consult with h[er] lawyer with a reasonable degree of rational understanding [] [and] a rational as well as factual understanding of the proceedings against h[er]." Dusky v. United States, 362 U.S. 402, 402 (1960). "Mental competency is not a static condition and is to be determined at the time of trial." Edwards v. State, 902 N.E.2d 821, 827 (Ind. 2009).

Unlike the majority and the post-conviction court, I find that an abundant amount of contemporaneous evidence exists which, viewed against the backdrop of Martin's prior psychological and psychiatric testing, casts a bona fide doubt on Martin's competency at the time of her second trial in January 2016. After Martin's first trial ended in a mistrial and she was found to be incompetent to stand trial, Martin was admitted at MSH for restoration efforts

pursuant to an order for MSH to certify within ninety days whether Martin had a substantial probability of obtaining comprehension sufficient to understand the proceedings and to formulate a defense in the foreseeable future. Despite Dr. Wingard's report, which placed Martin's IQ at 62 with an extremely low adaptive functioning percentile, and even though intellectual disability manifests itself during childhood and remains static throughout life whereas mental disability can be improved by medications, MSH placed Martin in legal education classes, drilling her weekly on legal definitions and terms.

[62] During Martin's 70-day residency at MSH—which was 20 days shorter than the trial court's order envisioned—Martin's legal education records do not support that she ever demonstrated an 'understanding' of the basic legal terminology in which she was drilled, as required by the competency standard enunciated in Dusky. The records show that Martin's ability to define words varied from week to week. During her first session on December 17, 2014, Martin could not independently identify a single word and required up to two verbal prompts to define the legal term. A week later, on December 24, 2014, Martin could partially define two terms and required prompts for other words, but no longer had any recollection of certain terms from the previous session. On December 31, 2014, the session revisited the words taught to Martin during the first session, but she was unable to define the terms again. On January 9, 2015, Martin could provide a partial definition of 'judge' but struggled with explaining the other terms. The following week, on January 16, 2015, Martin required several prompts from facilitators to define legal terminology. On

January 21, 2015, Trimble instructed Martin to identify the roles of the players in the courtroom on a drawing, which Martin was unable to do. Yet, despite Martin showing a very limited amount of recall and no understanding, on January 28, 2015, Martin received a score of 90% on the legal terminology testing administered by Trimble. The following day, on January 29, 2015, despite having purportedly just passed a legal education test with a score of 90%, Martin had another legal education class at which she knew only six or seven of the legal terms without prompting and required several verbal prompts for the other words. As a result, and solely relying on this passing test score, Drs. Bentz and Porter found Martin competent to stand trial.

[63]     As Martin's parents had advised that Martin 'can memorize,' but also cautioned that she has little understanding of how to use words and their meanings effectively in any useful manner, and based on her weekly lack of progression in the legal education classes, it can be reasonably inferred that the 90% test score is more reflective of her power to temporarily memorize, while her recall is almost non-existent as indicated by the rapid decline in knowledge retention between class sessions and after she was released from MSH. During the second trial, even Martin's counsel remarked that he was unsure whether Martin understood the proceedings she was involved in. From the time of Martin's IQ testing in 2011 until Dr. Cates' testing in 2021 for purposes of the post-conviction proceedings, Martin's intellectual functioning did not change. Dr. Cates' results— which were consistent with Dr. Wingard's findings— confirmed the depth of Martin's intellectual deficits. When Dr. Cates replicated

the legal education assessment conducted by MSH, Martin, after having experienced a full jury trial and one partial trial, "had very little factual understanding of courtroom procedures." (Tr. Vol. II, p. 95). Even though Drs. Bentz and Porter expressed doubt about Dr. Wingard's assessment of Martin's IQ, Drs. Bentz and Porter never conducted an intellectual and adaptive functioning test but merely relied on a legal terminology test which only measured Martin's ability to memorize definitions but not her ability to understand.

[64] Despite being aware of Martin's severe mental deficiencies, evaluations by two independent psychiatrists resulting in findings of incompetency to stand trial due to those deficiencies, and one of those doctor's written assertion that Martin's limitations were not likely to respond to psychiatric treatment, Leatherman took no steps to consider whether, by the time she went to trial in 2016, Martin was competent to be tried. Rather, he took Drs. Bentz's and Porter's evaluation and determination of competency at face value and forged ahead with the trial, opening Martin up to allegations from the State that she was a master manipulator.

[65] Commencing with a juror instigating the finding that Martin was incompetent to stand trial by handing a note to the trial judge questioning her competency during the first trial, there were numerous red flags waving prominently in front of counsel throughout these proceedings. Leatherman nonetheless closed his eyes and ignored them. Despite Dr. Wingard's determination of Martin's intellectual disability prior to her first trial, it was a layperson who suspected

Martin's mental state, rather than the professional whose job it was to safeguard her interests. During MSH's attempted 'restoration' of Martin's intellectual abilities to gain an understanding of the legal process, it was obvious that, although Martin had memorization capabilities to a certain extent, these abilities declined rapidly once she was no longer 'drilled.' By the time of the second trial, it can be reasonably inferred that, in the absence of constant drilling and repetition, Martin had resorted back to her initial intellectual baseline.

[66] While I would agree with the majority that under normal circumstances the objective standard of reasonableness based on prevailing professional norms would not require "counsel [to] have dug into the supporting records and perhaps located a countering expert opinion" given the two 2015 competency reports by Drs. Bentz and Porter, here, those normal circumstances ceased to exist as soon as the juror handed the trial court the note questioning Martin's mental abilities. See Slip Op. p. 24. Even though counsel had pursued an evaluation by Dr. Wingard and had read his competency evaluation of Martin as having "a very significant intellectual disability," Leatherman, as Martin's counsel, failed to recognize its importance and the presence of a possible legal defense, and instead had to be guided by a layperson in advocating for Martin. (Def's Exh. A, p. 3). At that point, Leatherman was placed on notice that Martin's intellectual disability might become a prominent issue in the proceedings—a notice that came to fruition with Martin's first mistrial based on her incompetence to stand trial. Even though Leatherman was very aware of

Martin's intellectual disability, he did not question the rather—surprising and sudden—high passing score on MSH's legal terminology test, nor did he examine the underlying supporting documents, challenge Drs. Bentz's and Porter's conclusions, or contact the experts who had declared Martin incompetent for her first trial. All this came to a culmination at the second trial, when Leatherman himself questioned Martin's understanding of the proceeding. Leatherman's actions were not a matter of trial strategy. Leatherman had evidence of Martin's severe intellectual disability and there were strong reasonable inferences that, at the time of the second trial, Martin, even if she showed an initial understanding, was no longer competent given her rapid decline in recalling the definitions of the legal terms after her drilling classes ended. The record is rife with warning signs that Martin's competency to stand trial should have been placed in doubt based on her intellectual disability, yet, despite all these indications, Leatherman failed to pursue a competency hearing. Unlike the majority, I conclude that any reasonable attorney, faced with these facts, would have believed there was a need to re-challenge Martin's competency.

[67] Accordingly, I conclude that Martin met her burden of establishing that, had Leatherman requested a competency hearing, there is a reasonable probability the outcome of her case would have been different. Leatherman was ineffective for failing to challenge Martin's competency to stand trial in 2016, and the post-conviction court's conclusion is clearly erroneous.